Filed 8/12/25  In re Dylan N. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| In re Dylan N., a Person Coming Under the Juvenile Court Law. | B340324, B344831 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>A.H.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. 20CCJP01036B) |

APPEALS from orders of the Superior Court of Los Angeles County, Natalie Nardecchia, Judge.  Affirmed.

Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Dawyn Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani Deputy County Counsel, for Plaintiff and Respondent, Los Angeles County Department of Children and Family Services.

————————————

In the first of her two appeals (B340324) involving her son Dylan N. (born 2014), Amber H. (Mother) challenges the juvenile court's visitation order, arguing it gave Dylan improper veto power over visits with her. She also contends the Los Angeles County Department of Children and Family Services (Department) failed to comply with the inquiry and notice requirements of the Indian Child Welfare Act (ICWA), 25 U.S.C. § 1901 et seq., and related state law. We affirm the visitation order but agree there was ICWA error.

In her second appeal (B337307) Mother challenges the summary denial of her Welfare and Institutions Code[1] section 388 petition to reinstate reunification services. She also argues the court erred in terminating her parental rights, contending the beneficial parental relationship exception applies. The court did not abuse its discretion in denying the section 388 petition and concluding termination of parental rights was appropriate because no exception to adoption applies. However, we conditionally reverse the order terminating parental rights for the juvenile court to conduct a proper ICWA inquiry.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Child Welfare History, the Referral, the Petition, and the Jurisdiction and Disposition Hearing*

In 2017, 2018, and 2019 the Department received referrals concerning ongoing domestic violence between Mother and Dylan's father, Stephen N. (Father). In 2020 the juvenile court sustained a petition alleging both parents had a history of

---

[1]     Statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

substance abuse and domestic violence, and that Mother also struggled with mental and emotional health issues. The court removed Dylan from Mother's custody, ordered family reunification services including a full drug and alcohol program with drug testing and AA meetings, and returned Dylan to her care in May 2021 before terminating jurisdiction. Father died in November 2020.

In February 2023 the Department filed a new petition under section 300, subdivision (b)(1), after Mother and then eight-year-old Dylan were in a car accident. Dylan was in the front seat without a seatbelt, and Mother had disabled the passenger airbag. She rear-ended another car, and Dylan struck his face on the dashboard, cutting his face and mouth and losing several teeth. Dylan was hospitalized. At the time, Mother was driving on a suspended license and, in violation of her probation after being convicted of driving under the influence, without a court-mandated ignition interlock device. The petition also alleged ongoing substance abuse, including use of alcohol, marijuana, methadone, Clonazepam, and Suboxone, which rendered Mother unable to care for Dylan. Several days before the crash, the Department had received another referral alleging Mother was "under the influence of alcohol or an unknown substance" while caring for Dylan. Mother had been renting a room from a woman named Sandy Y. for about a year. Sandy reported that Mother was not a good parent, Dylan appeared malnourished, she had seen Mother smoke something out of foil, and Mother told Sandy she was using fentanyl.

Two days after the accident, while Dylan was still hospitalized, he had a virtual visit with Mother. During the call, Dylan said to her, "Wake up, why are you falling asleep" and

3

asked her to stop being mean. When Mother brought up the accident, Dylan began to cry and ended the call, saying he no longer wanted to talk to her.

Dylan was detained from Mother and placed with a foster family from his earlier case. His caregivers noted that interactions with Mother appeared to "trigger" him. The caregivers attempted to facilitate a visitation schedule with Mother, but Dylan refused phone and in-person contact. In March 2023, the Department arranged a visitation schedule, but Mother said she preferred virtual visits because she was "getting things settled" and moving because her roommate was a "psychopath." Dylan refused virtual visits scheduled for March 6, 7, 8, and 9.

At the April 2023 jurisdiction and disposition hearing, the court sustained the petition and removed Dylan from Mother's custody. The court ordered family reunification services for Mother, including a full drug and alcohol program with testing, a 12-step program, parenting classes, conjoint counseling, and individual therapy to address case issues. It ordered two-hour monitored visits three times a week.

B.    *Six- and 12-Month Review Hearings*

In April 2023 Dylan had a supervised virtual call with Mother for his birthday, but he ended the call early after she became emotional and repeatedly asked why he did not want to see or talk to her. After that, Dylan refused further visits. Over the next several months, the Department encouraged Dylan to resume contact, offering short visits and video or phone calls, and asking what Mother could do to see him again. Social workers also forced Dylan to talk to Mother on the phone.

4

In June 2023 Dylan moved to the home of Bethany and Robert A. after his previous caregivers had a family emergency. That month, Dylan told his therapist he was afraid of Mother and did not trust her, Mother had been mean to him, and he knew when she was on drugs. In July, Bethany and Robert told the Department they were trying to convince Dylan to visit Mother. When the social worker advised Dylan's therapist that Dylan was refusing visits, the therapist responded that "bringing up [M]other [during their sessions] at the moment was not appropriate" because the therapist was trying to stabilize Dylan. Dylan was having angry outbursts and saying he did not want to live.

Dylan eventually agreed to an in-person visit in late July. But as he got into the car, he began crying and shaking and "screaming that he didn't want to go, that he didn't want to see [M]other." He eventually calmed down and had a positive visit with Mother, but was ready to leave after one hour and afterward told the social worker the visit took longer than he had wanted.

Over time, Dylan became more open to contact. Still, he remained anxious during car rides and sometimes asked to turn back. During visits Mother occasionally brought up inappropriate topics, such as her boyfriend dying in a "tragic accident" or Dylan's aunt's medical diagnosis. However, by August, the Department reported visits were "very positive." Dylan and Mother played soccer, and Dylan appeared to enjoy her attention, although he sometimes reacted negatively when she raised sensitive topics. By October, Dylan said he wanted more time with Mother, including unmonitored visits at her home.

According to the October 2023 six-month review report, Mother entered a detox program in May, then completed 90 days in a residential treatment program. However, she had not yet met the court-ordered minimum of six months in treatment. Mother had unstable housing, frequently missed appointments, and blamed the Department for Dylan's removal. At the October 2023 review hearing, the court found Mother's progress unsubstantial and continued jurisdiction for six more months.

In December 2023, Mother tested positive for amphetamine and methamphetamine. She denied drug use and claimed the testing facility might have mixed up the samples. Between September 2023 and March 2024, her tests were otherwise negative, but she missed a test in January.

By April 2024, Mother and Dylan were having unmonitored visits twice a week for four to five hours. The Department reported that the visits were going well and recommended further liberalization. Dylan expressed a desire to return to Mother's care. Mother had enrolled in psychiatric services and was taking prescribed medication. She secured housing and stable employment, completed an outpatient program in February, reached the fourth step of her 12-step program, found a sponsor, and continued individual therapy. She and Dylan began conjoint counseling in January.

At the April 2024 12-month review hearing, the Department recommended returning Dylan to Mother's custody with family maintenance services. Dylan's counsel noted that Dylan felt "a lot of nerves, excitement, [and] some mixed feelings" about reunification—he was "50/50" on the recommendation. After finding that Mother had made substantial progress, the court returned Dylan to her custody.

C.    *Supplemental Petition and Removal*

Mother tested positive for fentanyl the next month, and the Department filed a section 387 petition.  Mother denied using fentanyl and told the Department she had taken a muscle relaxer for a toothache that may have been laced with fentanyl, but her roommate, Allison, had photographs of burned foil and reported seeing Mother use fentanyl at least four times in recent weeks.  Allison stated she flushed the drugs down the toilet because Mother left them on the counter where Dylan could have found them.  Allison also reported that Mother would stop using drugs temporarily to pass a test, then start again.

Dylan was placed back with Bethany and Robert.  On the ride to their home, he cried and told the social worker, "I just need time to process.  I don't understand.  My mom lied to me.  She told me she was not using that stuff."  He briefly spoke to Mother by phone, telling her, "You lied to me mom" and "This is too much," before hanging up.  Dylan visited Mother at the end of June but asked to end the visit shortly after it began.  He then refused to see Mother, despite the social worker trying to convince Dylan otherwise.

At the June 2024 detention hearing, the court detained Dylan and ordered monitored visits for Mother for three hours, three times per week, despite the request of Dylan's counsel that visits be suspended.

In July Dylan's therapist reported that Dylan felt deeply hurt, was getting used to Mother's behavior, "saw this coming," and no longer wanted to live with or visit Mother.  The therapist reported, "I've also spoken to my supervisor and the previous therapist, and everyone agrees that conjoint therapy at this time

7

does not make sense.  Dylan really does not want to have any interaction with his mother and forcing the two of them into a room together would be detrimental to his mental and emotional well-being."  Dylan recalled seeing Mother put something in her mouth and act suspicious in the past, saying there was a clear difference between "when she's normal and when she's not."   He also disclosed Mother hit him "[p]retty often actually," including on his head with a pan.  Dylan said, "I don't want to live with my mom, and I don't want to visit with her.  I know that she'll do something like this again.  I've given her three chances and she's lied to me.  I'm kinda mad.  I don't want to interact with her.  The last time I saw her all she did was cry the whole time."  The Department reported that all staff agreed it was inappropriate to pressure Dylan to visit and that any recommendation for contact should come from his therapist.

Mother tested positive for cocaine in July.

At the August 2024 hearing, the court sustained the section 387 petition and removed Dylan from Mother's custody again, with Dylan to remain placed with Bethany and Robert.  The court ordered Mother to complete a full drug and alcohol program with testing, parenting classes, individual counseling, and conjoint therapy if recommended by Dylan's therapist.  Dylan's counsel again requested removal and no visitation, citing the therapist's concerns.  Over Dylan's objection, the court ordered three-hour monitored visits three times per week but stated, "Dylan can't be forced to go kicking and screaming to visits."  The court told Mother, "I know you want to see him, but it sounds like he's really—his therapist submits that he's not ready to do visits and not do conjoint either."  It also stated, "I also don't want to do anything that would actually hurt your ability to repair with him

by forcing him to go.  That is not, I think, best for him or your relationship, so I'm going to keep the visits as in the case plan.  I am not going to make a detriment finding at this time, but I just want it to be clear at this time that Dylan—his wishes really do need to be taken into account, especially given the therapist's statements in the report."

Mother timely appealed from the August 2024 jurisdiction and disposition orders.

D.     *Eighteen-Month Review Hearing*

As of the end of August 2024, Dylan had not visited Mother in eight weeks, and his therapist was not recommending conjoint therapy.  Mother told the Department she planned to enter a residential program.  However, she refused to drug test when asked, explaining she had taken Xanax over the weekend due to nerves.  She was "vague and dismissive" about the details.

In September Dylan told a social worker he did not want any contact with Mother—not in person, by phone, or via FaceTime—because he was upset with her and with being removed again.  He declined to read a letter Mother had written him in July.  When the social worker suggested Dylan meet with Mother just to pick up a gift and a surprise, Dylan initially agreed, but "after much thought, . . . said he believes the mother is 'bribing me to see her.  She did this before.  No, I don't want to see her.  I don't want the surprise or the gift.  I don't want to see my mom.' "  The social worker encouraged Dylan to reconsider and let the social worker know if he changed his mind.  Dylan was happy in his placement with Bethany and Robert, who were meeting his needs.

Later that month, approximately 44 days after the August hearing on the section 387 petition, the court held an 18-month review hearing under section 366.22.  Mother's counsel asked the court to continue family reunification services.  The Department recommended the court terminate reunification services.  Dylan's counsel agreed with the Department's recommendation, noting Dylan had lost trust in Mother, did not want to reunify, and was "thriving" in his placement.

The court found further reunification efforts were not in Dylan's best interest, based on the therapist's concerns, Dylan's own opposition to visitation and conjoint therapy, Mother's longstanding and unresolved substance abuse, and her lack of substantial compliance with her case plan.  The court noted "in particular, the statements by the therapist and Dylan himself regarding the harm and detriment to do conjoint, Dylan's very strong feelings of not visiting.  And it's not a veto by him, but it's just based on everything that's happened, it's subjected him to emotional harm."  Accordingly, the court found a substantial risk of detriment to Dylan if returned to Mother.  The court terminated reunification services and set a hearing under section 366.26.

In October 2024, Dylan told a social worker, "I want Robert and Bethany to adopt me.  I am happy here."  He did not want to have any communication with Mother, stating, " 'please, I just don't want to.  I gave my mom chances.  I don't want to do it again.' "  Bethany reported that Dylan had behavior problems at school.  Even so, Bethany and Robert remained committed to adopting Dylan.  Despite Dylan's firm opposition to contact, the social worker pledged to continue to ask Dylan about visitation

10

"as well as encourage [him] to communicate and visit with [M]other."

Dylan again refused contact with Mother in November, December, and January. The social worker repeated that she would continue encouraging Dylan to see Mother. By then, Bethany and Robert reported that Dylan's behaviors had improved and he "want[ed] to do well."

E.     *Mother's Section 388 Petition, the Section 366.26 Hearing, Termination of Jurisdiction, and the Final Visitation Order*

In February 2025 Mother filed a section 388 petition seeking custody or, alternatively, reinstatement of reunification services with unmonitored and overnight visits. In her supporting declaration, Mother described her changed circumstances: she had attended AA meetings for over a year and had a sponsor, completed a 60-day residential treatment program in October 2024, and participated in outpatient treatment with negative drug tests for six months. She also attended weekly individual and group therapy, had taken responsibility for her relapse, and completed her August 2024 case plan. Mother worked as a nanny and was studying to become a drug counselor.

Mother argued that reunification was in Dylan's best interests because "Dylan and his mother are bonded, and he knows his mother and for the majority of his life has been in his mother's custody. [Mother] can provide a[ ] safe and healthy environment and she can support Dylan emotionally, medically." She also claimed reunification would allow Dylan to process their relationship, which would be important for his long-term emotional well-being. Her father submitted a declaration stating

11

he had previously doubted Mother's sobriety but now believed she was committed to recovery.  Mother's AA sponsor similarly described Mother's progress as "incredible" and her commitment to sobriety as strong.

The court summarily denied the petition the same day, finding Mother had not made a prima facie showing of changed circumstances or that the proposed modification was in Dylan's best interest.

At the section 366.26 hearing the next day, the court addressed Mother's argument that it had improperly allowed Dylan to veto visitation.  Citing *In re Julie M.* (1999) 69 Cal.App.4th 41 (*Julie M.*) and *In re Brittany C.* (2011) 191 Cal.App.4th 1343, the court explained it had "consistently ordered" visitation, encouraged visitation during hearings, and "asked that Dylan be encouraged" to attend, but also emphasized "the court cannot, and social workers cannot, force children to go kicking and screaming to visits."  The court referenced Dylan's therapist's July 2024 report and found that the record contained unrefuted evidence of detriment.  It also noted that if Mother had wanted different or more specific visitation orders, she had the burden to request them.

Turning to the beneficial parental relationship exception to adoption, the court concluded Mother had not shown Dylan would suffer detriment by losing the parental relationship, observing "[t]here must be some type of harm beyond the fact that visits would cease" and there was no evidence that the reduced visitation had negatively impacted Dylan.  The court terminated Mother's parental rights and designated Bethany and Robert as Dylan's prospective adoptive parents.

Mother timely appealed both the summary denial of her section 388 petition and the order terminating her parental rights.

## DISCUSSION

A. *The Visitation Order Did Not Improperly Delegate Judicial Authority*

  1. *Applicable law and standard of review*

Section 362.1, subdivision (a)(1)(A), provides: "In order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent . . . , any order placing a child in foster care, and ordering reunification services, shall provide . . . [¶] . . . for visitation between the parent or guardian and the child. Visitation shall be as frequent as possible, consistent with the well-being of the child." (See *In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1044.) Section 362.1, subdivision (a)(1)(B), states: "No visitation order shall jeopardize the safety of the child." A parent's interest in visitation "cannot be maintained at the expense of [a child's] well-being," and the court must focus on the " 'possibility of adverse psychological consequences of an unwanted visit between mother and child.' " (*Julie M.*, *supra*, 69 Cal.App.4th at p. 50; see *In re Brittany C.*, *supra*, 191 Cal.App.4th at p. 1357 ["a court has the power to suspend visits when continuing them would be harmful to a child's emotional well-being"]; *In re S.H.* (2003) 111 Cal.App.4th 310, 317, fn. 9 (*S.H.*) ["The court may deny a parent visitation only if visitation would be harmful to the child."].)

"A juvenile dependency court has the power to issue 'all reasonable orders for the care, supervision, custody, conduct,

13

maintenance, and support of [a dependent] child' and to 'direct any reasonable orders to the parents or guardians of [that] child.' [Citation.] ' "The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly." ' " (*In re F.P.* (2021) 61 Cal.App.5th 966, 975; see § 362, subds. (a), (d).) "The power to regulate visits between dependent children and their parents rests with the juvenile court and its visitation orders will not be disturbed on appeal absent an abuse of discretion." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1070.)

  2. *The court's order did not grant Dylan veto power over visits*

  Mother contends that because the court stated "Dylan can't be forced to go kicking and screaming to visits" and "his wishes really do need to be taken into account," the court's visitation order improperly gave Dylan and his therapist "de facto veto power" over his visitation with Mother. She relies on the well-established principle that courts may not delegate absolute discretion over visitation to children, or to their therapist or social worker, because such delegations violate the separation of powers doctrine. (See *In re Korbin Z.* (2016) 3 Cal.App.5th 511, 516 ["the juvenile court cannot delegate the decision whether visitation will occur to any third party, including the child, the social services agency, or the guardian"]; *S.H.*, *supra*, 111 Cal.App.4th at p. 317 ["the power to decide whether *any* visitation occurs belongs to the court alone"].)

  However, a juvenile court may grant a social welfare agency "*limited* discretion" to consider the children's desires regarding visits with a parent. (*Julie M.*, *supra*, 69 Cal.App.4th at p. 50.) "[A]lthough the child's desires may be a dominant

14

factor," "visitation may not be dictated solely by the child involved." (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138; accord, *Julie M.*, at p. 51.)

This court's decision in *S.H.*, *supra*, 111 Cal.App.4th 310 is instructive. In fashioning the visitation orders after the children were removed from their mother, the juvenile court in *S.H.* "did not specify either the frequency or the length of visitation. Noting the children were fearful of their mother and that the boys had refused visits with her during their detention, the [juvenile] court added, 'The social worker shall describe to the children the safeguards in place for monitoring for both mother and fathers, and if the children refuse a visit, then they shall not be forced to have a visit.' " (*Id.* at p. 316.) We held that "by failing to mandate any minimum number of monitored visits per month or even to order that *some* visitation *must* occur each month, the [juvenile] court's abstract recognition of [the mother's] right to visitation is illusory, transforming the children's ability to refuse 'a visit' into the practical ability to forestall any visits at all." (*Id.* at p. 319.) "[W]hile the juvenile court may allow the child to refuse to attend a particular visit, to prevent the child from exercising a de facto veto power, there must be some assurance that, should that occur, another visit will be scheduled and actually take place. The simplest—but, by no means, the only—way to accomplish this would be for the juvenile court to order a minimum number of visits per month and to impose any essential conditions (for example, whether the visits are to be monitored or occur in a neutral setting), while allowing the Department to organize other details of the visitation. In no event, however, may the child's wishes be the *sole* factor in determining whether any visitation takes place, either as a

15

formal matter or, as occurred in the case now before us, by effectively giving the children the power to veto all visits." (*Ibid.*, fn. omitted; accord, *In re C.S.* (2022) 80 Cal.App.5th 631, 640 [no impermissible delegation of authority or "veto power" over visitation where "juvenile court ordered visits were to occur and prescribed how frequently and for how long" but gave the child's therapist discretion to decide when it was safe for visits to begin]; cf. *Julie M., supra*, 69 Cal.App.4th at p. 56 [visitation order was improper delegation where it gave the children "the option to consent to, or refuse, any future visits with their mother" and set no minimum amount of visitation].)

Unlike in *S.H.*, the juvenile court here set a minimum number of visits—"three times a week three hours each in person minimum." Thus, the court did not condition visitation solely on the consent of Dylan or his therapist. Rather, taking into account Dylan's past refusals to visit and his therapist's concerns about forcing Dylan to be with Mother, and noting the Department's request that the court find visits would be detrimental to Dylan and terminate visitation, the court set a visitation schedule with the reasonable caveat that "Dylan can't be forced to go kicking and screaming to visits." The court further considered that it did not "want to do anything that would actually hurt [Mother's] ability to repair with him by forcing him to go" because that would not be "best for [Dylan] or [their relationship]." This was a proper exercise of discretion, balancing the child's needs with Mother's rights. (See *Julie M., supra*, 69 Cal.App.4th at pp. 50-51 [a child's emotional readiness is proper factor for consideration in administering visitation so long as it is not the "the *sole* factor"].)

16

The court's visitation order "must be viewed in the context of the family dynamics in play" as well as the prior efforts of the Department and the court to facilitate visitation. (*In re Brittany C.*, *supra*, 191 Cal.App.4th at pp. 1356-57 [affirming juvenile court's order that visits between children and mother take place only in a therapeutic setting, when order followed months of efforts to encourage visitation in a less-restrictive setting].) Here, the Department and the court repeatedly attempted to encourage and facilitate visits throughout the lengthy history of the case. Dylan refused to visit with Mother from the outset, including after the initial car accident. Over the course of several months, social workers encouraged Dylan by offering shorter visits, proposing virtual or phone calls, asking what Mother could change to make visits possible, and even requiring him to speak with her. After Dylan's June 2024 removal, when he again refused to see Mother, the social workers continued these efforts—offering brief visits just to pick up a gift, encouraging video or phone calls, and checking in about his willingness to visit. These efforts continued throughout the approximately 44 days the challenged visitation order remained in effect before the court terminated Mother's parental rights. This case cannot reasonably be compared to those in which the juvenile court gave a child veto power over visits while never working to encourage reconciliation.

Finally, even assuming the court delegated too much discretion to Dylan regarding visits, Mother was not prejudiced, because "on this record the juvenile court would have been within its discretion if it simply denied [her] any visitation." (*In re Chantal S.* (1996) 13 Cal.4th 196, 214.) Here, Dylan's therapist had noted forcing Dylan to be together in a room with Mother

17

"would be detrimental to his mental and emotional well-being."
The record, which was replete with examples of Dylan's strong
adverse reactions to visits with Mother and mental health issues,
amply supported that opinion by the therapist and would have
supported an order suspending all visitation. "The fact that the
juvenile court rejected that course, and instead issued the
restrictive order challenged now, amounts to a windfall to
[Mother], not a violation of [her] rights." (*Ibid.*)[2]

B. *The Court Did Not Err in Summarily Denying Mother's*
   *Section 388 Petition*

Mother asserts the court erred in denying, without a

---

[2] Mother contends that after the September 2024 hearing at
which the court terminated Mother's reunification services and
set the matter for a section 366.26 permanency planning hearing,
her attorney neglected to timely file a writ petition in this court
requesting this court strike the purportedly improper August
2024 visitation order. (See Cal. Rules of Court, rule
8.450(e)(4)(A) [after juvenile court sets a hearing under section
366.26, notice of intent to file writ petition must be filed within 7
days].) Mother then filed in this court a motion for relief from
default and a subsequent petition for writ of habeas corpus
asserting ineffective assistance of counsel, both of which we
denied. Mother suffered no prejudice from not being permitted to
raise the visitation issue in a writ petition. She was able to raise
the issue in her appeal from the section 387 jurisdiction and
disposition hearing, and, as we have discussed, the visitation
order was proper.

We deny Mother's request for judicial notice of her trial
counsel's declaration in the habeas proceeding because it is not
relevant.

hearing, her February 2025 section 388 petition seeking custody or, alternatively, reinstatement of reunification services with unmonitored and overnight visits. The court did not abuse its discretion.

1. *Applicable law and standard of review*

"Section 388 provides for modification of juvenile court orders when the moving party presents new evidence or a change of circumstance and demonstrates modification of the previous order is in the child's best interest. [Citations.] ' "The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child." [Citation.] "[T]he change in circumstances must be substantial." ' " (*In re Malick T.* (2022) 73 Cal.App.5th 1109, 1122, fn. omitted; see *In re Matthew M.* (2023) 88 Cal.App.5th 1186, 1194 (*Matthew M.*).) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; see *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 (*Marilyn H.*); *In re D.P.* (2023) 92 Cal.App.5th 1282, 1295; *In re J.M.* (2020) 50 Cal.App.5th 833, 847.)

The parent "need only make a prima facie showing to trigger the right to proceed by way of a full hearing." (*Marilyn H.*, *supra*, 5 Cal.4th at p. 310.) Section 388 "petitions are to be liberally construed in favor of granting a hearing to consider the parent's request." (*Id.* at pp. 309-310; accord, *In re R.A.* (2021)

19

61 Cal.App.5th 826, 836 (*R.A.*); see Cal. Rules of Court, rule 5.570(a) ["A petition for modification must be liberally construed in favor of its sufficiency"].)  " 'A "prima facie" showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited.' " (*In re B.C.* (2011) 192 Cal.App.4th 129, 141.)  "[I]f the petition fails to make a prima facie showing (1) of a change of circumstances or new evidence requiring a changed order, and (2) the requested change would promote the best interests of the child," the juvenile court may summarily deny it without a hearing.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 188-189; see *R.A.*, *supra*, 61 Cal.App.5th at p. 836.)  "To support a section 388 petition, the change in circumstances must be substantial." (*In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223.)

We review the summary denial of a section 388 petition for abuse of discretion.  (*R.A., supra*, 61 Cal.App.5th at p. 837.)  "We do not . . . reweigh the evidence and substitute our judgment for that of the juvenile court."  (*Matthew M., supra*, 88 Cal.App.5th at p. 1195; see *In re Maya L.* (2014) 232 Cal.App.4th 81, 104, fn. 6.)

    2.  *Mother did not show substantially changed circumstances*

The juvenile court did not abuse its discretion in determining Mother failed to make a prima facie showing of substantially changed circumstances.  Most of Mother's evidence focused on her achieving sobriety.  But as the court recognized, Mother had previously reached similar milestones, only to relapse.  For example, Mother completed a full drug and alcohol program and participated in AA meetings in her 2020 case, but had relapsed by the time this case began.  In May 2023, Mother

entered a detox program and then transitioned to residential treatment. Yet in December, while enrolled in outpatient care, she tested positive for amphetamine and methamphetamine. By February 2024, she had completed her outpatient program, progressed to the fourth step of her 12-step plan, found a sponsor, and been in therapy. But just one month after regaining custody of Dylan in April, Mother tested positive for fentanyl. Her roommate reported that Mother had been using drugs regularly in the weeks prior. Mother again tested positive for cocaine in July and refused to test in August, stating she had taken Xanax, which was not prescribed. Thus, Mother's latest successful attempt to gain sobriety, while laudable, does not amount to a substantial change from the previous circumstances of the case. (See *In re Ernesto R.*, *supra*, 230 Cal.App.4th at p. 223 ["To support a section 388 petition, the change in circumstances must be substantial."]; *In re Justice P.*, *supra*, 123 Cal.App.4th at p. 189 ["In determining whether the petition makes the necessary [prima facie] showing, the court may consider the entire factual and procedural history of the case."].)

   3. *Mother did not show that reunification was in Dylan's best interest*

  The juvenile court also did not abuse its discretion in finding Mother did not establish a prima facie showing that extending reunification services was in Dylan's best interest. At this stage of the case, the court's primary focus was not on Mother's interest in custody but on Dylan's need for permanence and stability. (*In re Stephanie M., supra*, 7 Cal.4th at p. 317; *In re J.C.* (2014) 226 Cal.App.4th 503, 527 ["[A]fter reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must

21

establish how such a change will advance the child's need for permanency and stability."].)

Mother had already received 22 months of reunification services. She failed to show how extending services further would promote stability for Dylan. The evidence supported that it would not. After Mother relapsed in June 2024, Dylan's therapist reported that he was deeply hurt and said "forcing the two of them into a room together would be detrimental to his mental and emotional well-being." Dylan expressed a mature and clear understanding of the situation, stating he had given Mother multiple chances and no longer trusted her.

By contrast, in October 2024, Dylan told a social worker, "I want Robert and Bethany to adopt me. I am happy here." The record supports that Dylan had found emotional security and continuity in his placement. (See *In re J.C., supra*, 226 Cal.App.4th at p. 526 [child's interest in permanency and stability would be furthered by staying in a "loving and stable placement"]; *In re D.P., supra*, 92 Cal.App.5th at p. 1295 [juvenile court properly focused on the " 'positive and secure attachments' " between the child and her foster family].) Though Dylan had initially shown behavioral problems, those behaviors improved after several months of living with Bethany and Robert and not visiting Mother. By December 2024 Bethany and Robert reported Dylan's behavior was much better and he "want[ed] to do well."

Mother concedes that Dylan was "happy and comfortable in his foster home," but nonetheless argues reunification would serve Dylan's best interest because the two were bonded and she had raised Dylan for most of his life. But the law requires more than an existing parental relationship. (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 260 [" '[t]he presumption favoring natural

parents by itself does not satisfy the best interests prong of section 388' "].)  Mother offered no concrete evidence that returning Dylan to her custody would benefit him.  (See *In re K.L.* (2016) 248 Cal.App.4th 52, 62-63 ["court did not err in concluding that . . . broad assertions did not constitute a prima facie showing that the proposed placement changes would be in the best interests of the children"].)  While Mother claims reunification would help Dylan "resolve" his feelings and avoid future regret about cutting off his relationship with Mother, this theory was speculative.  There was no evidence Dylan was confused or uncertain.  On the contrary, he repeatedly expressed his feelings with clarity and insight.

Finally, Mother argues the court's summary denial of her section 388 petition without a hearing violated her due process rights under the state and federal constitutions.  But because the petition did not meet the prima facie standard, the court had no obligation to hold an evidentiary hearing.  We find no due process violation.  (See *Marilyn H., supra,* 5 Cal.4th at pp. 306-310; *In re Angel B.* (2002) 97 Cal.App.4th 454, 460-461.)

C.     *The Court Did Not Err in Terminating Mother's Parental Rights*
       1. *Applicable law and standard of review*
"At the section 366.26 hearing, the focus shifts away from family reunification and toward the selection and implementation of a permanent plan for the child." (*In re S.B.* (2009) 46 Cal.4th 529, 532; accord, *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).)  " 'Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of

the exceptions listed in section 366.26, subdivision (c)(1).' " (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224-1225 (*B.D.*); accord, *In re Celine R.* (2003) 31 Cal.4th 45, 53 ["the court must order adoption and its necessary consequence, termination of parental rights, unless one of the specified circumstances provides a compelling reason for finding that termination of parental rights would be detrimental to the child"].)

Under the beneficial parental relationship exception in section 366.26, subdivision (c)(1)(B)(i), the parent may avoid termination of parental rights if the parent establishes by a preponderance of the evidence "that the parent has regularly visited with the child, that the child would benefit from continuing the relationship, and that terminating the relationship would be detrimental to the child. [Citations.] The language of this exception, along with its history and place in the larger dependency scheme, show that the exception applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C., supra,* 11 Cal.5th at pp. 629-630; accord, *B.D., supra*, 66 Cal.App.5th at p. 1225.)

A parent has regular visitation and contact when the parent " 'visit[s] consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra*, 11 Cal.5th at p. 632; accord, *In re I.E.* (2023) 91 Cal.App.5th 683, 691 (*I.E.*).) Whether " 'the child would benefit from continuing the relationship' " with his or her parent is shaped by factors "such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' "

(*Caden C.*, at p. 632; accord, *In re Katherine J.* (2022) 75 Cal.App.5th 303, 317 (*Katherine J.*).) When determining whether termination of parental rights would be detrimental to the child, courts consider "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, at p. 633; accord, *In re D.P.* (2022) 76 Cal.App.5th 153, 164.) " 'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights." (*Caden C.,* at p. 633; accord, *Katherine J.,* at p. 317.)

"While application of the beneficial parental relationship exception rests on a variety of factual determinations properly reviewed for substantial evidence, the ultimate decision that termination would be harmful is subject to review for abuse of discretion." (*Caden C., supra*, 11 Cal.5th at p. 630; accord, *I.E., supra*, 91 Cal.App.5th at p. 691.)

2. *The court properly determined the beneficial parental relationship exception did not apply*

Mother argues that the court's alleged denial of her visitation rights "compromised Mother's due process rights to litigate and preserve her parental rights." As discussed above, we disagree with the premise that Mother was denied visitation; thus, we also reject her due process challenge to the termination of her parental rights.

Even setting aside the visitation prong of the *Caden C.* analysis, Mother failed to carry her burden as to the two other prongs: that Dylan would benefit from the continuing

relationship and that terminating the relationship would be detrimental. (See *Caden C., supra,* 11 Cal.5th at pp. 629-630.) As to the benefit of continuing the relationship, Mother points to her historical bond with Dylan and their once "significant and emotional relationship." But even Mother acknowledges that Dylan no longer viewed the relationship as positive. His trust had eroded over time, and his desire to avoid contact with Mother was consistent throughout much of the case. Dylan had been removed from and returned to Mother multiple times starting at age six, and by the time of the hearing, he had lived outside her care for approximately 21 of the past 22 months. (*Caden C.,* at p. 632 [whether " 'the child would benefit from continuing the relationship' " is shaped by factors like " 'the portion of the child's life spent in the parent's custody [and] the "positive" or "negative" effect of interaction between parent and child' "]; accord, *In re Katherine J., supra,* 75 Cal.App.5th at p. 317.)

Mother also failed to show terminating the relationship would be detrimental to Dylan. Dylan and his therapist consistently reported that contact with Mother caused him emotional harm. The therapist specifically advised that forcing Dylan to be in the same room with Mother would be detrimental to his mental health. Mother's assertion that Dylan would eventually forgive her and their relationship could be repaired through therapy is speculative. And there was no evidence that Dylan suffered any harm from the lack of visits. (See *I.E., supra,* 91 Cal.App.5th at p. 692 [evidence the child "experienced no distress at the end of visits" supported the juvenile court's finding "the relationship was not so substantial that its severance would be detrimental to the child"].) To the contrary, the record shows Dylan was thriving in his placement with Bethany and Robert,

26

with whom he had lived for a total of 17 months as of the section 366.26 hearing.

Adoption remains the preferred permanent plan unless the parent can show exceptional circumstances. (*Caden C., supra,* 11 Cal.5th at p. 631.) On this record, the juvenile court did not abuse its discretion in concluding that the stability and permanence Dylan had found with Bethany and Robert outweighed any potential harm from severing his relationship with Mother. (*Id* at p. 634; *Katherine J., supra*, 75 Cal.App.5th at p. 317.)

D. *The ICWA Inquiry Was Inadequate*
  1. *Facts relevant to ICWA*

During the family's prior dependency case in 2020, Mother and Father both denied any Indian ancestry. During that case, Father, who at the time was 60 years old, said he was born in Connecticut, that his mother had been a nurse and his father a police officer, and that he had an older sister with whom he was not close.[3]

In February 2023 the Department asked Mother about possible Indian ancestry, and she reported no reason to believe Dylan was an Indian child. One week later, Mother submitted an ICWA-020 form indicating no known Indian ancestry. At the February detention hearing, the juvenile court confirmed with Mother that neither she nor Dylan's father had any Indian heritage. Based on those representations, the court found it had no reason to believe ICWA applied. In June 2024, Mother again

---

[3]     The record does not reveal whether the Department had contact information for any of these family members during the 2020 dependency case.

27

denied Indian ancestry in an ICWA-010(A) form. The Department asked additional individuals—including Dylan's maternal aunt, maternal grandmother, maternal grandfather, and Mother's then-roommate—about possible Indian heritage, but all denied any ancestry.

   2. *ICWA and the duty of inquiry*

Congress enacted ICWA to protect Indian children and "to promote the stability and security of Indian tribes and families" by formalizing federal policy and standards regarding the removal and placement of Indian children outside the family home. (25 U.S.C. § 1902; see *In re Dezi C.* (2024) 16 Cal.5th 1112, 1129 (*Dezi C.*).) "ICWA establishes minimum standards for state courts to follow before removing Indian children from their families and placing them in foster care or adoptive homes." (*Dezi C.*, at p. 1129; see 25 U.S.C. §§ 1902, 1921.) ICWA applies in proceedings to terminate parental rights. (See §§ 170, subd. (c), 177, subd. (a), 180; see also Cal. Rules of Court, rule 5.480.)

   "[W]hen ICWA applies, 'the Indian child's tribe shall have a right to intervene at any point' in a proceeding involving the removal of an Indian child from their family." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1129; see 25 U.S.C. § 1911(c); *In re Isaiah W.* (2016) 1 Cal.5th 1, 8.) The court and any petitioner seeking termination of parental rights have an affirmative and continuing duty to inquire whether a child who is subject to the proceedings is, or may be, an Indian child. (§ 224.2, subd. (a); Cal. Rules of Court, rule 5.481(a).) This duty to inquire "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or

28

neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b)(2); Cal. Rules of Court, rule 5.481(a)(1)-(2).) ICWA and related state law define "extended family member," if not separately defined by the law or custom of the tribe, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C. § 1903(2); see § 224.1, subd. (c) [providing "extended family member" follows the definition stated in ICWA].)

When an ICWA inquiry is inadequate, prejudice is impossible to ascertain. (*Dezi C.*, *supra,* 16 Cal.5th at p. 1136.) Under these circumstances, remand is required along with directions to the court and any other responsible party to fully comply with the duty of inquiry—and, when necessary, ICWA's further notice requirements—and to document that compliance. (*Ibid.*)

   3.  *Remand for ICWA compliance is necessary*

Mother contends the Department's ICWA inquiry was inadequate because the Department made no effort to identify or contact any paternal relatives who might have information about Indian ancestry. We agree.

Although Father denied Indian ancestry in 2020 before his death, nothing in the record shows the Department asked whether any of his relatives was alive or available for contact. The Department responds that Mother provided no contact information for paternal relatives. The Department is under no obligation to contact family members if it is unable to do so. (See *In re Q.M.* (2022) 79 Cal.App.5th 1068, 1082 ["[W]e cannot ask the agency to intuit the names of unidentified family members or

29

to interview individuals for whom no contact information has been provided."].)  But, at a minimum, the Department should have asked Mother if such relatives exist and whether she has their contact information, and if Mother provided contact information, made reasonable efforts to contact them.  (See §§ 25 U.S.C. § 1903(2), 224.1, subd. (c), 224.2, subd. (b)(2); Cal. Rules of Court, rule 5.481(a)(1)-(2)).)  It cannot assume none is available without any inquiry.

Accordingly, we conditionally reverse the order terminating parental rights and remand for the Department to fulfill its duties under ICWA and for the court to hold a hearing to determine whether ICWA applies.  (See *Dezi C.*, *supra*, 16 Cal.5th at p. 1137.)

## DISPOSITION

The juvenile court's August 2024 visitation order and its order summarily denying Mother's section 388 petition are affirmed.  The order terminating Mother's parental rights is conditionally reversed, and the juvenile court is directed to ensure the Department complies fully with ICWA and related California law.  If, after reasonable inquiry, the court finds there is no reason to believe Dylan is an Indian child, or if no tribe or agency determines Dylan is an Indian child after notice has been provided under ICWA, the judgment terminating parental rights shall be reinstated.  If, on the other hand, a tribe determines

30

Dylan is an Indian child and the trial court finds ICWA applies, the court shall proceed in accordance with ICWA.


                                           STONE, J.

We concur:


          MARTINEZ, P. J.



          FEUER, J.